# EXHIBIT A

FRANCHISE __25529__

DATE EXECUTED __11/15/01__

# FRANCHISE AGREEMENT

## DOCTOR'S ASSOCIATES INC.

with

__MANOJ TRIPATHI__

__SADHANA TRIPATHI__

_____

_____

FTC
04/01/01

*FRANCHISE AGREEMENT*

This Franchise Agreement (this "Agreement") is made ___November 15___, __2001__ between Doctor's Associates Inc., a Florida corporation with a principal office in Fort Lauderdale, Florida ("we" or "us"), and ___Manoj Tripathi; Sadhana Tripathi___ of ___California___ ("you"), for one (1) SUBWAY® restaurant (the "Restaurant") to be located in the State of ___California___.

## RECITALS:

A. We are the owner of a proprietary system (the "System") for establishing and operating restaurants featuring sandwiches and salads under our trade name and service mark SUBWAY®. We developed the System spending considerable money, time, and effort. The System includes the trademark SUBWAY®, other trademarks, trade names, service marks, commercial announcements (slogans) and related insignia (logos) we own (the "Marks"); goodwill associated with the Marks; trade dress; recipes; formulas; food preparation procedures; business methods, forms, and policies; trade secrets; knowledge; techniques; and developments.

B. We operate and franchise others to operate SUBWAY® restaurants using the System, including the Marks.

C. You want access to the System to establish and operate the Restaurant at a location you select and we approve.

D. You acknowledge the System includes confidential and proprietary information which we, our Affiliates (defined below), our development agents and our Affiliates' development agents, franchisees, and agents, will give you to use only to establish and operate the Restaurant. An "Affiliate" means a person or entity that directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, another person or entity.

E. We have granted, and will continue to grant, access to the System to others to establish and operate SUBWAY® restaurants. Our goal is to be the number one quick service restaurant system in every market we enter. This Agreement does not grant you the right to own additional SUBWAY® restaurants. You acknowledge we do not have to sell you additional franchises or consent to your purchase of existing franchises.

F. You acknowledge the only consideration we receive from you for granting you the license to use the System consists of the Franchise Fee, the Royalty and performance of your other promises under this Agreement.

G. You acknowledge you personally received our Franchise Offering Circular and its exhibits, including this Agreement (the "Offering Circular"), at or prior to your first personal meeting with our employee, development agent, agent, or representative and at least ten (10) business days before you signed this Agreement, and you signed a Receipt for the Offering Circular. You represent you carefully reviewed the Offering Circular and had enough time to consult with a lawyer, accountant, or other professional advisor, if you wanted, and you understand and agree to be bound by the terms, conditions, and obligations of this Agreement. You also represent you had full opportunity, with the help of a professional advisor if you used one, to ask us and our employees, development agents, agents, or representatives, all appropriate questions and we and our employees, development agents, agents or representatives answered all of your questions to your satisfaction, except questions on the subject of potential earnings, discussed in the following paragraph. If you did not use a professional advisor, you represent you are satisfied relying on your own education, experience, and skill in evaluating the merits of a franchise offering.

H. You acknowledge no employee, agent, or representative of ours, or of our Affiliates, or our development agents, made any oral, written or visual representation or projection to you of actual or potential sales, earnings, or net or gross profits. You also acknowledge no employee, agent, or representative of ours, or of our Affiliates, or our development agents, has made any statements that are contrary to, or different from, the information in the Offering Circular, including but not limited to any statements about advertising, marketing, media support, media penetration, training, store density, store locations, support services and assistance, or the costs to establish or operate a SUBWAY® restaurant, except for any statements you wrote in at Paragraph 15.

I. You represent you understand the risks of owning a business and specifically the risks of owning a SUBWAY® restaurant, and you are able to bear such risks. You acknowledge the success of the Restaurant will depend primarily on your own efforts and abilities and those of your employees, and you will have to work hard and use your best efforts to operate the Restaurant. You also acknowledge other factors beyond our or your control will affect the Restaurant's success, including but not limited to, competition, demographic patterns, consumer trends, interest rates, economic conditions, government policies, weather, local laws, rules and regulations, legal claims, inflation, labor costs, lease terms, market conditions, and other conditions which may be difficult to anticipate,

1

assess, or even identify. You acknowledge that you are subject to all federal, state and local laws relating to the franchise business. You recognize some SUBWAY® restaurants have failed and more will fail in the future. You understand that your success will depend substantially on the location you choose. You acknowledge our approval of the location for the Restaurant does not guarantee the Restaurant's success at that location and the Restaurant may lose money or fail.

J. This Agreement does not grant you any territorial rights and we and our Affiliates have unlimited rights to compete with you and to license others to compete with you.

K. YOU UNDERSTAND AND ACKNOWLEDGE THAT PARAGRAPH 14 OF THIS AGREEMENT AMENDS ANY EXISTING FRANCHISE AGREEMENTS YOU HAVE WITH US, to include the following provisions of this Agreement: Subparagraph 5.c. (regarding payment of taxes, costs and expenses, responsibility for employment practices and employees, insurance and indemnification), Subparagraph 5.f. (regarding reporting information electronically by personal computer based point-of-sale system), Subparagraph 5.i. (regarding increasing advertising contributions), Subparagraph 5.o. (regarding use of domain names), Paragraph 8 (regarding defaults and termination), Paragraph 10 (regarding dispute resolution), Subparagraph 11.f. (regarding interest and late fees), Subparagraph 11.m. (regarding no territorial rights and our unlimited right to compete), Paragraph 13 (regarding governing law, merger clause and continuing effect), and Paragraph 17 (regarding limitation of liability).

L. YOU UNDERSTAND AND ACKNOWLEDGE ALL DISPUTES OR CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT, EXCEPT FOR CERTAIN OF OUR CLAIMS DESCRIBED IN SUBPARAGRAPH 10.e., WILL BE ARBITRATED IN CONNECTICUT, UNDER PARAGRAPH 10 BELOW, IF NOT RESOLVED INFORMALLY OR BY MEDIATION.

## AGREEMENT:

Acknowledging the above recitals, we and you (the "parties") agree:

1. **FRANCHISE FEE**. When you sign this Agreement, you will pay us the Franchise Fee checked below, which we will not refund except as we specifically provide for below. [Check one]:

\_\_\_\_\_a. **Standard Fee**. $10,000. You will pay our standard fee for a first or additional franchise.

__X__b. **Reduced Fee**. $4,000. (i) You represent you are currently a SUBWAY® franchisee and all of your franchises are in substantial compliance with the Operations Manual (defined below) and there are no defaults under any Franchise Agreements; or (ii) you are purchasing the franchise for a location you operate as a unit of a convenience store, gasoline retailer or other minimum fifty (50) unit chain or of a co-branding partner we have approved, or you are a member of an approved organization with at least one hundred (100) potential restaurant locations, and you represent you are in good standing with the chain or the organization. If you are purchasing a franchise for a specific location under clause (ii), we may disapprove the location within ninety (90) days, terminate this Agreement and refund the Franchise Fee. If any of these representations are not true when a lease is signed, you agree to pay an additional $6,000.

\_\_\_\_\_c. **Extension Fee**. $1,000. You previously signed a Franchise Agreement and paid a Franchise Fee but did not sign a Sublease in the time permitted. The original Franchise Agreement is replaced by this Agreement. You agree to sign a Sublease within two (2) years with no right to any extension.

\_\_\_\_\_d. **Satellite Fee**. $1,000. You will operate the Restaurant as a limited restaurant supported by an existing base restaurant. This Agreement for the Restaurant, including the Satellite Rider, is the separate Franchise Agreement for the satellite restaurant.

\_\_\_\_\_e. **Add On Fee**. $6,500. Individuals who are existing SUBWAY® franchisees represent their franchises are in substantial compliance with the Operations Manual and there are no defaults under any Franchise Agreements. The Franchise Fee is the reduced Franchise Fee of $4,000 plus an add-on fee of $2,500 to add individuals who are not SUBWAY® franchisees. If the representations of the existing franchisees are not true when a lease is signed, you agree to pay an additional $3,500.

\_\_\_\_\_f. **School Lunch**. $0. A school board, school district, municipality or institutional food service provider (or its nominee), or an individual existing franchisee is signing this Agreement to establish a restaurant in a school (grades K-12). This Agreement includes the School Lunch Rider.

\_\_\_\_\_g. **Transfer**. $0. Franchise No._____ owned by _____ ("Seller") was transferred to you. (Seller may have paid a transfer fee.) The Seller's Franchise Agreement is replaced by this Agreement.

2

_____ h. **Amendment or Renewal.** $0. This Agreement replaces and/or renews the Franchise Agreement dated
_____.

**2. ROYALTY PAYMENTS.** You will pay us weekly a Royalty equal to eight percent (8%) of the gross sales from the Restaurant and each sandwich restaurant you operate throughout the term of this Agreement. "Gross sales" means all sales or revenues, including catering and delivery, from your business exclusive of Sales Tax (as defined in Subparagraph 5.c.).

**3. PERMITTED ACCESS TO THE SYSTEM AND MARKS.** We grant to you during the term of this Agreement:

   a. Continued access to the System, including the loan of a copy of the Operations Manual.

   b. Continued access to information pertaining to new developments, improvements, techniques and processes in the System.

   c. A limited, non-exclusive license to use the Marks in connection with the operation of the Restaurant at one (1) location at a site we and you approved.

**4. COMPANY OBLIGATIONS.** We will provide you during the term of this Agreement:

   a. A training program for establishing and operating a restaurant using the System, at a location we choose. You will pay all transportation, lodging, and other expenses to attend the training program.

   b. A representative or development agent of ours to call on during our representative's or development agent's normal business hours for consultation concerning the operation of the Restaurant.

   c. A program of assistance, including periodic consultations with our representative or development agent in a location we choose; a newsletter advising of new developments and techniques in the System; and access during their normal business hours to specified office personnel you may call for consultations concerning the operation of the Restaurant.

**5. YOUR OBLIGATIONS.** You agree to do the following:

   a. In regards to the Sublease for the Restaurant:
      (1) You will sign a Sublease for the Restaurant ("Sublease") within two (2) years after signing this Agreement. If you do not, this Agreement will automatically expire unless you i) request and are granted an extension, ii) pay an extension fee of $1,000 US, and iii) sign our then current franchise agreement.
      (2) Before opening, you must successfully complete the training program we provide under Subparagraph 4.a.
      (3) The Restaurant will be at a location found by you and approved by us. We or an Affiliate we designate will lease the premises and sublet them to you. We or our designee will attempt to secure a fair rent for the premises but we cannot represent it will be the best available rent in your area. If you materially breach this Agreement or the lease, we or our designee may terminate the Sublease with you after giving the notice required in the Sublease.
      (4) After you sign the Sublease, you will construct, equip, and open the Restaurant to the specifications contained in the Operations Manual.

   b. You will operate your business in compliance with applicable laws and governmental regulations, including, but not limited to, those concerning labor, taxes, health, and safety. You will obtain and keep in force, at your expense, any permits, licenses, registrations, certifications or other consents required for leasing, constructing, or operating the Restaurant. Upon request, you will forward to us copies of any documentation relating to these items.

   You will operate the Restaurant in accordance with our Operations Manual (the "Operations Manual"), which contains mandatory and suggested specifications, standards and operating procedures, which may be updated from time to time as a result of experience, or changes in the law or marketplace. You will make, at your sole expense, changes necessary to conform to the Operations Manual, including, but not limited to, repairing items not in good condition or not functioning properly, and upgrading and remodeling the Restaurant, including leasehold improvements, furniture, fixtures, equipment, and signs. You acknowledge these requirements are necessary and reasonable to preserve the identity, reputation, and goodwill we developed and the value of the franchise. You agree to make the repairs and the updates, and pay all reasonable, required costs within reasonable time periods we establish. You will adhere to quality control standards we prescribe in the Operations Manual or elsewhere with respect to the character or quality of the products you will sell or the services you will perform in association with the Marks. You must respond to and satisfy all customer complaints. If you fail to operate the Restaurant in accordance

3

with the Operations Manual, we may terminate this Agreement under Subparagraphs 8.a. and 8.b. In lieu of termination, we may impose a fine for each day the Restaurant is not in compliance with the Operations Manual to compensate us for damages and for costs we incur to compel you to bring the Restaurant into compliance. The Operations Manual, as amended from time to time, is intended to further the purposes of this Agreement and is specifically incorporated into this Agreement. The Operations Manual constitutes a confidential trade secret and will remain our property. You may not, and you may not allow others to, reproduce or photocopy the Operations Manual, in whole or in part, without our written consent. You will not conduct any business or sell any products at the Restaurant other than the business and products we approve for the location.

    c. You will be solely responsible for all costs of building and operating the Restaurant, including, but not limited to, sales or use tax, goods and services tax, gross receipts tax, excise tax or other similar tax ("Sales Tax"), other taxes, fees, customs, stamp duty, other duties, governmental registrations, construction costs and permits, equipment, furniture, fixtures, signs, advertising, insurance, food products, labor, utilities, and rent. We will not have any liability for these costs. You will pay any Sales Tax imposed by law on the Franchise Fee, Royalty, advertising fees, and any other amounts payable under this Agreement, whether assessed on you or on us. If we must make the payment to the taxing jurisdiction for any Sales Tax that is your responsibility under this Agreement, we will pass the amount on to you and you will reimburse us. You must register to collect and pay Sales Taxes before you open the Restaurant, and you must maintain these registrations during the term of this Agreement. You will recruit, hire, train, terminate, and supervise all Restaurant employees, set pay rates, and pay all wages and related amounts, including any employment benefits, unemployment insurance, withholding taxes or other sums, and we will not have any responsibility for these matters.

    The insurance you must obtain and maintain includes, but is not limited to, statutory worker's compensation in the minimum amount required by law, comprehensive liability insurance, including products liability coverage, in the minimum amount of $2,000,000, and business vehicle coverage, including owned vehicle liability and non-owned vehicle liability coverage, in the minimum amount of $1,000,000. You will keep all insurance policies in force for the mutual benefit of the parties. All insurance policies must name as additional insureds, us, our Affiliates, our Development Agent assigned to the Restaurant (the "Development Agent"), and our agents, representatives, shareholders, directors, officers and employees, and those of our Affiliates and the Development Agent (the "Additional Insureds"), with such coverage being primary coverage. Your insurance company must agree to give us at least twenty (20) days' prior written notice of termination, expiration, material modification, or cancellation of your policy, or cancellation of any of the Additional Insureds as an additional insured. You agree to defend, indemnify, and save harmless, the Additional Insureds, from and against all liability, injury, loss, cost and expense of any type (including lawyers' fees), and damages that arise in or in connection with your operation of the Restaurant, regardless of cause or any fault or negligence (including sole or concurrent negligence) by the Additional Insureds, which indemnification will not be relieved by any insurance you carry. You acknowledge we may modify or increase the insurance requirements during the term of this Agreement due to changes in experience, and you agree to comply with the new requirements. You acknowledge we may from time to time designate one or more approved insurance brokers or companies under a master insurance program we establish for franchisees generally, and you must purchase your coverage from one of the approved insurance brokers or companies.

    d. You will not own or operate any other business anywhere, nor will you assist another person, directly or indirectly, during the term of this Agreement, identical with or similar to the business reasonably contemplated by this Agreement, except as our duly licensed franchisee at a location we approve. You agree to pay us $10,000 for each business you own or operate in violation of this Subparagraph, plus eight percent (8%) of its gross sales, as being a reasonable pre-estimate of the damages we will suffer. We may also seek to enjoin your activities under Subparagraph 10.e.

    e. You will sign and deliver to us appropriate electronic funds transfer preauthorized draft forms (or forms serving the same purpose) for the Restaurant's checking account before you open the Restaurant. By signing these forms, you authorize us to withdraw money from the account on a timely basis to collect the appropriate Royalty, contributions to the Subway Franchisee Advertising Fund Trust, interest, late fees, and other charges that you will owe, under this Agreement or under any other Franchise Agreement you have with us. You authorize us to collect amounts you owe to the Subway Franchisee Advertising Fund Trust under our own name, for unpaid advertising contributions.

    f. You will report your gross sales by telephone, facsimile, electronically, or by other means we permit, within two (2) days after the end of the business week (currently Tuesday). You will submit weekly summaries showing results of the Restaurant's operations by the following Saturday, in writing or in electronic form, as we permit, to locations we designate. You will use and maintain at the Restaurant a personal computer based point-of-sale system and software compatible with our requirements and an address to send and receive electronic mail and attachments on the Internet and access to the World Wide Web. You agree to install additions, substitutions, and upgrades to the hardware, software, and other items to maintain full operational efficiency and to keep pace with changing technology and updates to our requirements. You will record all sales and designated business information in your system in the manner we specify in the Operations Manual. You will report your information to us electronically at weekly or other intervals we specify. You also agree we may call up or poll your system to retrieve the information at

any time. We may estimate gross sales if you fail to report on time. We may withdraw money from your checking account for Royalty and advertising contributions under the above Subparagraph, for the amounts then due based on reported or estimated sales. We will adjust charges based on estimated gross sales after we determine actual sales. We agree that the amendment of your other Franchise Agreements with us under Paragraph 14 related to the requirements of this Subparagraph 5.f. to use a personal computer based point-of-sale system and electronic mail will apply with a delayed effective date of January 1, 2002.

g. You will allow our representatives and our development agent and our development agent's representatives to enter your business premises without prior notice during regular business hours to inspect, audit, photocopy, and videotape your business operations and records, and to interview the Restaurant's employees and customers. You will keep all of the following at the Restaurant for a period of three (3) years: cash register tapes, control sheets, weekly inventory sheets, deposit slips, bank statements and canceled checks, sales and purchase records, business and personal tax returns, and accounting records. You also grant us permission to examine without prior notice to you, all records of any supplier relating to your purchases.

h. You will pay us, if we or our representatives determine that you under-reported gross sales, all Royalty, advertising contributions and other charges due on the gross sales that were not reported, plus interest and the late fee as provided in Subparagraph 11.f. If reported gross sales for any calendar year are less than ninety-eight percent (98%) of the actual gross sales for that period, you will reimburse us for all costs of the investigation that discovered the under-reporting, including salaries, outside accountant fees, travel, meals, and lodging. You agree to pay for all costs of any audit that did not occur due to your failure to produce your books and records at the time of audit if we notified you in writing of the audit at least five (5) days before the scheduled date. If you fail to submit all of your information to be audited, we may estimate your sales and charge you.

i. You will pay weekly into the Subway Franchisee Advertising Fund Trust ("SFAFT"), three and one-half percent (3 ½%) of gross sales of the Restaurant. Franchisees may increase the advertising percentage for the country temporarily or permanently by a two-thirds (2/3) vote on the basis of one (1) vote for each operating restaurant. Franchisees operating in any market designated by SFAFT may approve a temporary or permanent additional advertising percentage to be used for local advertising by a two-thirds (2/3) vote. We and our Affiliates may negotiate advertising rebates and programs with suppliers. We or our Affiliate may forward the rebates to SFAFT or put them into an advertising fund to be spent at our or our Affiliate's complete unrestricted discretion for the benefit of franchisees. You acknowledge advertising contributions may not benefit franchisees in any area in proportion to the amounts they paid.

j. You will not place "For Sale" or similar signs at or in the general vicinity of the Restaurant or use any words in any advertising that identify the business offered for sale as a SUBWAY® restaurant.

k. You will make prompt payment of all charges you owe to us, our Affiliates, your vendors, and the landlord of the premises, in addition to Royalty and advertising contributions to SFAFT, and pay all Sales Tax, other taxes, and debts of the Restaurant as they become due.

l. You will use or display the Marks on materials and stationery used in connection with the Restaurant only as we permit and as provided in this Agreement or in the Operations Manual. You will display the following notice in a prominent place at the Restaurant: *"The SUBWAY® trademarks are owned by Doctor's Associates Inc. and the independent franchised operator of this restaurant is a licensed user of such trademarks."*

m. You will operate and promote the Restaurant under the name SUBWAY® or other name we direct without prefix or suffix added to the name. You will not use the word "SUBWAY" as part of a corporate or other business name. You will not license or purchase vehicles, fixtures, products, supplies or equipment, or incur any obligations except in your individual, corporate or other business name. Any sign face bearing the name SUBWAY® will remain our property even though you may have paid a third party to make the sign face. You will not establish a local domain name for a website using the word "SUBWAY" without our prior written authorization. The domain name must be registered under the name of DAI. We will require you to cancel your registration of the domain name if you fail to obtain our prior written authorization. At our request, you must remove any inappropriate information we deem not to be in the best interest the SUBWAY® franchise system. All present or future goodwill associated with the Marks belongs to us. You agree not to contest the validity or ownership of any of the Marks, or to assist any other person to do so. You agree you do not have and you will not acquire any ownership rights in the Marks, and you will not register or attempt to register any of the Marks. You agree to assign and transfer to us your rights in or registrations of the Marks that you have or may have. All references to the Marks in this Agreement include any additional or replacement Marks associated with the System that we authorize you to use.

n. You will always indicate your status as an independent franchised operator and franchisee to others and on any document or information released by you in connection with the Restaurant.

6. **RELOCATION OF THE RESTAURANT.** You may relocate the Restaurant only with our prior written approval. If the lease expires and is not renewed, or if the landlord terminates the lease, you will have one (1) year to

5

relocate the Restaurant provided you did not breach the Sublease. You will pay all expenses and liabilities to terminate the lease and move if you relocate the Restaurant. If you materially breach this Agreement, we or our designee may cancel the Sublease with you after giving the notice required in the Sublease.

**7. TERM OF AGREEMENT.** If, under local law, this Agreement must be registered then it will not become effective until it is. The term of this Agreement is twenty (20) years from the date of this Agreement and will automatically renew for additional twenty (20) year periods unless either party chooses not to renew and sends written notice to the other at least six (6) months before the expiration of any twenty (20) year period. Upon renewal you may choose to either i) continue under the terms of this Agreement the royalty rate will increase to ten percent (10%) with all other terms and conditions of this Agreement remaining the same, or ii) you may sign our then current Franchise Agreement which will replace this Agreement and which may contain terms or conditions that differ from this Agreement, including financial terms, except for the royalty rate which will remain at eight percent (8%). There will be no renewal fee.

**8. TERMINATION AND EXPIRATION PROVISIONS.**

a. If we give you ten (10) days' written notice, we may, at our option and without prejudice to any of our other rights or remedies provided under this Agreement, terminate this Agreement if (i) you abandon the Restaurant, or (ii) you fail to pay any money you owe us, our Affiliates, SFAFT, the landlord of the premises, or any amounts we may become liable to pay because of your action or omission, or (iii) you are evicted from the Restaurant location for non-payment of rent or related charges. The notice will specify the default and provide you ten (10) days to remedy the default from the date of delivery of the notice.

b. If we give you ninety (90) days' written notice, we may, at our option and without prejudice to any of our other rights or remedies provided under this Agreement, terminate this Agreement if you (i) do not substantially perform all of the terms and conditions of this Agreement not otherwise covered in Subparagraph 8.a., or (ii) you lose possession of the premises where the Restaurant is located, or (iii) you under-report your gross sales by two percent (2%) or more for a calendar year, or (iv) you become insolvent, make an assignment for the benefit of creditors or seek bankruptcy relief, either reorganization or liquidation, in any court, legal or equitable, or (v) you lose any permit or license which you need to operate the Restaurant, or (vi) you fail to comply with your duties under this Agreement or the Operations Manual. The notice will specify the default and provide you sixty (60) days to remedy the default from the date of delivery of the notice. If you cure the default within sixty (60) days, the notice will be void.

c. Beginning with a second notice of default under Subparagraph 8.a. or 8.b., we may include a clause that because of repeated cause for termination, your subsequent repeat of a given default in the next twelve (12) months will be good cause for a final termination without providing you the opportunity to remedy the default or even if you remedy the default.

d. Our rights to notify you of a default and to terminate this Agreement are not affected by the notification, mediation, and arbitration procedures under Paragraph 10. If we terminate this Agreement and you dispute the termination, you must file a demand for arbitration as provided in Subparagraph 10.g. in order to seek reinstatement. We may enforce the termination by filing for arbitration and then court confirmation of the arbitration award without first seeking mediation or informal discussions.

e. Upon termination or expiration of this Agreement, all of your rights under this Agreement will terminate. We have the right to repurchase the Restaurant at fair market value within thirty (30) days of termination or expiration of this Agreement. If we do not repurchase the Restaurant, you must change the appearance of the Restaurant so it will no longer be identified as a SUBWAY® restaurant, and you must stop using the System, including the Marks, signs, colors, structures, personal computer based point-of-sale system software developed for SUBWAY® restaurants, printed goods and forms of advertising indicative of our sandwich business and return the Operations Manual to us. You are required to cancel any permits, licenses, registrations, certifications or other consents required for leasing, constructing, or operating the restaurant. If you fail to do so within a reasonable time, we are authorized to cancel them for you. If you breach this provision, you will pay us $250 per day for each day you are in default, as being a reasonable pre-estimate of the damages we will suffer. We may also seek to enjoin your activities under Subparagraph 10.e.

f. If any of the provisions above which permit us to terminate the franchise violate your state law, if it applies, such state law relating to termination will prevail over the offending provisions.

g. (1) For one year after the termination, expiration or transfer of this Agreement, you will not directly or indirectly engage in, or assist another to engage in, any sandwich business within three (3) miles of any location where a SUBWAY® restaurant operates or operated in the prior year. If you do, we may seek to enjoin your activities under Subparagraph 10.e. (2) From now until 10 years after the termination, expiration or transfer of this Agreement, if you do engage in, or assist another to engage in, any sandwich business at any location you will pay us $10,000 for each sandwich business location you are associated with, plus eight percent (8%) of the gross sales

6

during the entire time those locations are open. Nothing in this Subparagraph or any other provision of this Agreement grants you any territorial or other exclusive rights.

    b. You acknowledge the System includes confidential and proprietary information, including, but not limited to recipes, formulas, specifications, food preparation procedures, blueprints, vendor lists, business methods, forms and policies, marketing and development plans, advertising programs, creative materials, methods and plans, trade secrets, knowledge, techniques, and developments, information contained in the Operations Manual and the newsletter *Subway to Subway*, and all information we or our Affiliates designate as confidential ("Confidential Information"). Confidential Information will remain our property or our Affiliate's property. You will not, during or after the term of this Agreement, without our prior written consent, disclose to any unauthorized person or entity, or use for the benefit of any unauthorized person or entity, any Confidential Information. You acknowledge if you violate this provision, substantial injury could result to us, our Affiliates, you and other SUBWAY® franchisees. If you violate this provision, you will be liable to us for our damages and we may also seek to enjoin your activities under Subparagraph 10.e.

    f. Upon termination or expiration of this Agreement, all telephone listings, telephone numbers, Internet addresses and domain names used by the public to communicate with the Restaurant will automatically become our property if permitted by state law. In any event, you agree not to use any telephone numbers, Internet addresses or domain names associated with the Restaurant after the termination or expiration of this Agreement.

### 9. TRANSFER AND ASSIGNMENT OF THE RESTAURANT.

    a. You may only transfer the Restaurant with this Agreement and only with our prior written approval, as provided in this Paragraph 9. You may transfer the Restaurant and this Agreement to a natural person or persons (not a corporation), provided: (1) you first offer, in writing, to sell the Restaurant to us on the same terms and conditions offered by a bona fide third party purchaser, we fail to accept the offer within thirty (30) days, and we approve your contract with the purchaser; (2) each purchaser has a satisfactory credit rating, and is of good moral character; (3) each purchaser received a passing score on our standardized math and English test (if not already a SUBWAY® franchisee) and attended and successfully completed our training program or agrees to attend our first available training program promptly after the sale (and then must successfully complete the training program or will be in default under the Franchise Agreement); (4) each purchaser received the required disclosure documents in accordance with our policies and federal and state laws, rules, and regulations, and signs the then current form of Franchise Agreement which will amend and replace this Agreement and may contain terms that differ from this Agreement, including financial terms, and assumes the Sublease for the Restaurant; (5) you pay in full all money you owe us, our Affiliates, and SFAFT, for all your SUBWAY® restaurants and you are not otherwise in default under this Agreement; (6) you pay us $5,000 (plus any applicable Sales Tax) for our legal, accounting, training, and other expenses we incur in connection with the transfer; (7) you deliver a general release in favor of us, the Development Agent and our Affiliates, and agents, representatives, shareholders, partners, directors, officers, and employees of ours and of the Development Agent and our Affiliates signed by you and each purchaser; and (8) at or prior to the time of the transfer you bring the Restaurant into full compliance with our then current standards set forth in the Operations Manual. All transfer documents will be in English in a form satisfactory to us.

    b. You may assign your rights under this Agreement to operate the Restaurant (but not this Agreement) to a corporation (or similar entity) provided: (1) the corporation is newly organized and its activities are confined exclusively to operating the Restaurant; (2) you are, and remain at all times, the owner of the controlling interest of the corporation; (3) the corporation delivers to us a written assumption of your obligations under this Agreement; (4) all shareholders of the corporation deliver to us a written guarantee of the full and prompt payment and performance by the corporation of all its obligations to us under the assignment; (5) you acknowledge to us in writing that you are not relieved of any personal liability; and (6) you deliver a general release described in Subparagraph 9.a., signed by you, the corporation, and each shareholder of the corporation. You will also remain personally liable under the Sublease.

    c. Your rights under this Agreement may pass to your next of kin or legatee upon your death subject to satisfying the applicable requirements of Subparagraph 9.a. Each such transferee must receive a passing score on our standardized math and English test (if not already a SUBWAY® franchisee), deliver a written assumption to us, and agree in writing to attend our next training session. Each transferee must then successfully complete our training program or will be in default under this Agreement. The transferees will sign our then current form of Franchise Agreement, at our request, which will amend and replace this Agreement and may contain terms that differ from this Agreement, including financial terms, but they will not pay a franchise fee. The transferees will also assume the Sublease in writing or sign the then current form of Sublease. Signing the then current forms of Franchise Agreement and Sublease alone will not affect the original expiration dates of those agreements.

    d. We may transfer and assign this Agreement without your consent, and this Agreement will inure to the benefit of our successors and assigns.

**10. NOTIFICATION, MEDIATION AND ARBITRATION OF DISPUTES.** The parties want to settle all issues quickly, amicably, and in the most cost effective fashion. To accomplish these goals, the parties agree to the following provisions that will apply to resolve any dispute or claim arising out of or relating to this Agreement, or any other Franchise Agreement the parties have with each other (a "Dispute"):

a. The parties agree to first notify each other in writing of any Dispute. The written notification will specify, to the fullest extent possible, the notifying party's version of facts and all elements of the Dispute. You agree to use your best efforts to communicate with us, including the Ombudsmen Department, and the recognized franchise owners representative organization, to attempt to resolve the Dispute. If the parties do not resolve the Dispute within thirty (30) days after receipt of the notice of the Dispute, the parties agree to non-binding mediation, and to in good faith use best efforts to resolve the Dispute. Mediation will be conducted under the auspices of the CPR Institute for Dispute Resolution by a mediator from your region, or by another mediation service the parties select. The parties will share the cost of the mediation service equally. Any and all discussions, negotiations, findings or other statements by the mediator and/or the parties in connection with the mediation, whether oral or written, will be privileged and confidential and will not be admissible in evidence in any arbitration or litigation proceedings. If the parties do not resolve the Dispute after the mediation proceeding, we or you may commence arbitration as provided in this Paragraph 10. Mediation is a condition precedent to arbitration, except as specifically provided in this Agreement. Each party will be responsible for its own costs, including lawyers' fees, in any mediation, arbitration, or court proceeding, except as otherwise provided in this Paragraph 10.

b. The parties agree that except as otherwise provided in this Agreement, the Federal Arbitration Act will apply to all Disputes, including the breach of this Agreement and any alleged precontractual representations or conduct, violations of the Racketeering Influenced and Corrupt Organizations Act (RICO), applicable federal and state franchise disclosure or franchise relationship laws, unfair trade practice laws, or similar laws, and the business that is the subject of this Agreement is engaged in interstate commerce.

c. The parties will arbitrate any Dispute the parties do not settle under the discussion and mediation procedures above, and any Dispute which this Agreement provides will be submitted directly to arbitration, except as provided in this Agreement. The arbitration will be held in accordance with the Commercial Arbitration Rules of the American Arbitration Association (the "AAA"), and under the Expedited Procedures of such rules or under the Optional Rules For Emergency Measures of Protection of the AAA, if they may apply to the Dispute, at a hearing administered by the AAA to be held at Bridgeport, Connecticut or in such other location in the State of Connecticut designated by the AAA. Any court having jurisdiction may enter judgment on the arbitrator's award. Except as provided in this Agreement, a party must commence and pursue mediation and arbitration to resolve Disputes before commencing legal action.

d. If a court of competent jurisdiction decides the requirement to arbitrate a Dispute is unenforceable because applicable law does not permit the type of claim involved to be resolved by arbitration, or because this Agreement limits a party's rights or remedies in a manner applicable law does not permit, or for any other reasons, then under Subparagraph 11.c., the entire arbitration clause is not void. Only the portions of the arbitration clause with respect to such claim or claims as are necessary to comply with applicable law will be invalid and considered severable, but the remainder will be enforced.

e. You recognize if you breach the provisions of this Agreement that prohibit you from infringing intellectual property rights in the Marks or in copyrighted items, or from disclosing Confidential Information, or from competing, you may cause irreparable harm to us, our Affiliates, other franchisees, and the franchise system as a whole. We or an Affiliate may bring an action in any court having jurisdiction in connection with any such breach, and may seek damages, injunctive relief, or both. Notwithstanding any other provision of this Agreement, the mediation and arbitration procedures above, and the monetary limitation on damages in Paragraph 17 below, will not apply to any such breach.

f. You agree the only person or entity from which you may seek damages or any remedy for any Dispute, including the breach of this Agreement, is us, or our successor or assign. You agree you will not name our shareholders, directors, officers, employees, agents, or Affiliates, or the Development Agent, or the shareholders, directors, officers, employees, agents, or partners of our Affiliates or the Development Agent, in any mediation, arbitration, or legal action. You agree none of these other entities or individuals will be liable to you; only we will. You acknowledge we have relied on this representation in signing this Agreement.

g. Notwithstanding any other provision in this Agreement, we may send default notices to you and terminate this Agreement without first giving notice of a Dispute or pursuing mediation or arbitration. You may dispute the termination by filing a demand for arbitration within thirty (30) days after the effective date of the termination, without first giving notice of a Dispute or pursuing mediation. You may only demand a Declaratory Judgment in the arbitration to determine if the termination was invalid and only request an award reinstating this Agreement. The arbitrator may only rule on the validity of the termination and the award may only grant or deny the request for reinstatement. You will waive the remedy of reinstatement if you do not file for arbitration within the time allowed. We may file a demand for arbitration requesting validation of the termination of this Agreement and appropriate relief

8

and may seek court confirmation of any arbitration award without first giving notice of a Dispute or pursuing mediation.

h. If a party (i) commences action in any court, except to compel mediation or arbitration, or except as specifically permitted under this Agreement, prior to an arbitrator's final decision, or (ii) commences any arbitration or litigation in any forum except where permitted under this Paragraph 10, then that party is in default of this Agreement. The defaulting party must commence arbitration (or litigation, if permitted under this Paragraph 10), in a permitted forum prior to any award or final judgment. The defaulting party will be responsible for all expenses incurred by the other party, including lawyers' fees. If a party defaults under any other provision of this Paragraph 10, or under any provision of Paragraph 17, including, but not limited to, making a claim for special, incidental, consequential, punitive, or multiple damages, or damages in excess of the amount permitted under this Agreement, or you name a person or entity in any mediation, arbitration, or legal proceeding other than us, the defaulting party must correct its claim. The defaulting party will be responsible for all expenses incurred by the other party, or the improperly named persons or entities, including lawyers' fees, and will be liable for abuse of process.

i. Any mediation settlement or arbitration award will have a binding effect only on the actual Dispute mediated or arbitrated, and will not have any collateral effect on any other Dispute whatsoever, whether in litigation, arbitration, mediation, or other dispute resolution proceeding. You will mediate, arbitrate, or litigate each Dispute with us on an individual basis. You will not consolidate your Dispute in any mediation, arbitration, or litigation action, with a claim by any other franchisee, individual, or entity.

j. If a court of competent jurisdiction decides the arbitration clause in Subparagraph 10.c. is unenforceable, and after any and all final appeals the decision is upheld, the parties agree to litigate a Dispute, after unsuccessful mediation, in Connecticut. The parties waive any right to trial by jury, except where waiver is prohibited by applicable federal or state law.

k. The parties submit to the jurisdiction of any tribunal or court in accordance with Subparagraph 10.c. and Subparagraph 10.j., for arbitration or litigation of any Dispute, and waive any right to object to the location being inconvenient. Such jurisdiction will be exclusive, except for our right or our Affiliates' rights under Subparagraph 10.e. to bring an action in any court having jurisdiction, to protect intellectual property rights in the Marks, copyrighted items, and Confidential Information, or to enforce the covenants not to compete.

l. We or you must start the action permitted under this Paragraph 10 to resolve a Dispute, whether by giving notice of the Dispute or filing for mediation, arbitration, litigation, or any other permitted proceeding, within one (1) year from the time the events occurred which give rise to the Dispute, or the claim will be barred, except we may bring a claim under Subparagraph 5.b. for under-reported sales within five (5) years from the under-reporting or the maximum time period allowed by law. We or you may bring an action for indemnification within one (1) year after we or you have notice of the claim that gives rise to the indemnification action. The parties recognize this Subparagraph may have shorter time limits than applicable law will permit.

m. Our waiver of any of your defaults will not constitute a waiver of any other default and will not prevent us from requiring you to strictly comply with this Agreement.

n. The sublessor, whether us or our designee, may evict you from the Restaurant if you breach the Sublease. The provisions of this Paragraph 10 regarding Disputes do not apply to our actions or our designee's actions to enforce the terms of the Sublease or the lease under this Agreement, and we or our designee do not have to give notice of the dispute or claim or file a mediation or arbitration to enforce rights under the Sublease.

o. We and our Affiliates, and you and your Affiliates, will not withhold any money due to the other party and its Affiliates, under this Agreement or any other agreement. A party or its Affiliate that withholds money in violation of this provision will reimburse the party or its Affiliate whose money is withheld for the reasonable costs to collect the withheld money, notwithstanding the provisions of Subparagraph 10.a. These costs include, but are not limited to, mediation and arbitration fees, court costs, lawyers' fees, management preparation time, witness fees, and travel expenses incurred by the party or its Affiliate or SFAFT, or its agents or representatives.

11. **OBLIGATIONS OF THE PARTIES.** The parties also agree as follows:

a. You are, and will at all times be identified as, a natural person and an independent contractor. You are not our agent, partner, or employee. This Agreement does not create a partnership, joint venture, agency, or fiduciary relationship.

b. All or any part of your rights and privileges under this Agreement will return to us if for any reason you abandon, surrender, or suffer revocation of your rights and privileges.

c. If, for any reason, any court, agency, or tribunal with valid jurisdiction in a proceeding to which we are a party, decides in a final, non-appealable ruling, that a portion of this Agreement is contrary to, or in conflict with any

9

applicable present or future law, rule, or regulation, after giving such portion the broadest legal interpretation possible, then that portion will be invalid and severable. The remainder of this Agreement will not be affected and will continue to be given full force and effect. Any invalid portion will be deemed not to be a part of this Agreement as of the date the ruling becomes final if you are a party to the proceedings, or upon your receipt of notice of nonenforcement from us. If a court, agency, or tribunal decides a covenant not to compete is too broad as to scope, time, or geographic area, the parties authorize the court, agency or tribunal to modify the covenant to the extent necessary to make it enforceable.

d. No previous course of dealing or usage in the trade not specifically set forth in this Agreement will be admissible to explain, modify, or contradict this Agreement.

e. The parties will give any notice required under this Agreement in writing, and will send it by registered or certified mail. We will address notices to you at the Restaurant or the address at the start of this Agreement until you designate a different address by written notice to us. You must notify us of any address changes, including changes to your electronic mail address. You will address notices to us to Doctor's Associates Inc., 325 Bic Drive, Milford, CT 06460-3059, Attention Legal Department. Any notice will be deemed given at the date and time it is received, or refused, or delivery is made impossible by the intended recipient.

f. If your payment is more than one (1) week late you will pay a late fee equal to ten percent (10%) on any Royalty, advertising contributions, or other charges you will owe us under this Agreement. Also, you will pay interest on all your past-due accounts at up to eighteen percent (18%), but the late fee and interest will not be greater than the maximum rate allowed by law in the state in which our principal office is located or the Restaurant is located, whichever is higher.

g. You must immediately notify us of any infringement of or challenge to your use of any of the Marks, or claim by any person of any rights in any of the Marks. We will indemnify you for all damages for which you are held liable in any proceeding arising out of the use of any of the Marks in compliance with this Agreement, provided you notify us promptly, cooperate in the defense of the claim, and allow us to control the defense of the action. If a third party challenges any of the Marks claiming infringement of alleged prior or superior rights in the Mark, we will have the option and right to modify or discontinue use of the Mark and adopt substitute Marks in your geographical business areas and in other areas we select. Our liability to you under such circumstances will be limited to your cost to replace signs and advertising materials. You acknowledge and agree we have the exclusive right to pursue any trademark infringement claims against third parties.

h. If we must purchase the Restaurant's equipment, leasehold improvements, or both, under any applicable state law, rule, regulation, or court decision, if we terminate this Agreement, the purchase price will be your original cost, less depreciation and amortization, based on a five (5) year life under the straight-line method.

i. If the landlord terminates the lease for the Restaurant and an arbitrator or court determines you did not breach the Sublease and it was our fault or our Affiliate's fault the landlord terminated the lease, our obligation to you will be limited to the original cost of your leasehold improvements, less depreciation based on a five (5) year life under the straight-line method. We will pay you when you reopen the Restaurant in a new location. If the arbitrator or court determines you breached the Sublease or it was not our fault or our Affiliate's fault the landlord terminated the lease, we and our Affiliate will have no obligation to you for termination of the lease.

j. If we are in default under this Agreement, you may give us written notice by registered or certified mail, within ninety (90) days of the start of the default clearly stating each act or omission constituting the default. If we do not cure the default to your satisfaction within sixty (60) days after we receive your notice, you may give us notice a Dispute exists. The parties will work diligently to attempt to resolve the Dispute. If the parties do not resolve the Dispute within thirty (30) days, the parties may follow the procedures to start mediation and then arbitration under Paragraph 10. Any default contained in your notice will be considered cured if you do not file for mediation and then arbitration.

k. You will pay us Sales Tax or other tax assessed on all payments you make to us that we must collect from you or pay ourselves to the taxing authority.

l. You will pay us any applicable Sales Tax or other tax on behalf of the local taxing authority at the same time and in the same manner you pay for the taxable goods or services, whether or not the requirement is specifically stated in this Agreement.

m. You understand and acknowledge this Agreement does not grant you any territorial rights and there are no radius restrictions or minimum population requirements which limit where we can license or open another SUBWAY® restaurant, unless provided under applicable state law. We and our Affiliates have unlimited rights to compete with you and to license others to compete with you. You understand and acknowledge we and our Affiliates retain the exclusive unrestricted right to produce, distribute, and sell food products, beverages, and other products, under the SUBWAY® mark or any other mark, directly and indirectly, through employees, representatives, licensees,

assigns, agents, and others, at wholesale, retail, and otherwise, at any location, without restriction by any right you may have, and without regard to the location of any SUBWAY® restaurant, and these other stores or methods of distribution may compete with the Restaurant and may adversely affect your sales. You do not have any right to exclude, control, or impose conditions on the location or development of any SUBWAY® restaurant, other restaurant, store or other method of distribution, under the SUBWAY® mark or any other mark.

**12. TERMS, REFERENCES AND HEADINGS.** All terms and words in this Agreement will be deemed to include the correct number, singular or plural, and the correct gender, masculine, feminine, or neuter, as the context or sense of this Agreement may require. Each individual signing this Agreement as the franchisee will be jointly and severally liable. References to "you" will include all such individuals collectively and individually. References to dollars ($) in this Agreement refer to the lawful money of the United States of America. The paragraph headings do not form part of this Agreement and shall not be taken into account in its construction or interpretation.

**13. GOVERNING LAW.** This Agreement will be governed by and construed in accordance with the substantive laws of the State of Connecticut, without reference to its conflicts of law, except as may otherwise be provided in this Agreement. The parties agree any franchise law or business opportunity law of the State of Connecticut, now in effect, or adopted or amended after the date of this Agreement, will not apply to franchises located outside of Connecticut. This Agreement, including the Recitals and all exhibits, contains the entire understanding of the parties and supersedes any prior written or oral understandings or agreements of the parties relating to the subject matter of this Agreement. The parties may not amend this Agreement orally, but only by a written agreement, except we may amend the Operations Manual from time to time as provided in this Agreement. The provisions of this Agreement which by their terms are intended to survive the termination or expiration of this Agreement, including, but not limited to, Subparagraphs 5.c., 5.h., 5.k., 8.d., 8.e., 8.g., 8.h., 11.b., 11.h., 11.l., and 11.m., and Paragraphs 10, 13, 14, 15, 16, 17, and 19, will survive the termination or expiration of this Agreement.

**14. AMENDMENT OF PRIOR AGREEMENTS.** The parties want to encourage advertising cooperation and franchisee compliance, provide for amicable, timely, and cost effective resolution of Disputes with limitations on liability, and clarify certain provisions of existing Franchise Agreements. To achieve these goals, this Agreement has revised provisions regarding payment of taxes, costs and expenses, responsibility for employment practices and employees, insurance, indemnification, increasing advertising contributions, reporting information electronically by personal computer based point-of-sale system, defaults and termination, interest and late fees, dispute resolution, no territorial rights and our unlimited right to compete, governing law, merger clause, continuing effect, and limitation of liability. You agree to accept the provisions set forth in Subparagraph 5.c., Subparagraph 5.f., Subparagraph 5.i., Paragraph 8, Paragraph 10, Subparagraph 11.f., Subparagraph 11.m., Paragraph 13, and Paragraph 17 in this Agreement, for this Agreement and to the amendment of all your other existing Franchise Agreements with us to include these provisions (if the existing Franchise Agreements do not already include these provisions). **EACH OF YOU SIGNING THIS AGREEMENT AS FRANCHISEE ACKNOWLEDGES AND UNDERSTANDS THAT THIS PARAGRAPH 14 AMENDS ALL YOUR EXISTING FRANCHISE AGREEMENTS WITH US, AND ANY SUCH AMENDMENT WILL SURVIVE THE TERMINATION OR EXPIRATION OF THIS AGREEMENT.** This Paragraph 14 amends any existing Franchise Agreement you have if every individual who signed the existing Franchise Agreement as franchisee signs this Agreement or another Franchise Agreement containing the provisions of this Paragraph 14.

**15. RELEASE.** You acknowledge no employee, agent, or representative of ours, or our Affiliates, or our development agents, has made any representations to you, and you have not relied on any representations, except for the representations contained in this Agreement, the Offering Circular, and our advertising materials, and except those you have written in below:

_____

_____

_____

**16. NO PRIOR CLAIMS.** You represent that as of the date of this Agreement, you have no claims of any type against us, our Affiliates, or the Development Agent, or our agents, representatives, shareholders, directors, officers, and employees, or those of our Affiliates and the Development Agent, except those you have written in below:

_____

_____

_____

You hereby release each of these individuals and entities from all claims other than those you listed above. You acknowledge and understand that any list of claims and the general release will include any alleged breaches of franchise or other laws, and any alleged breach of agreement, relating not only to this Agreement, but also to any other franchise you have or had with us at any time.

**17. LIMITATIONS ON DAMAGES.**

a. The parties agree no party will be liable for special, incidental, consequential, or punitive damages, and no party will seek multiple forms of damages of any kind in any Dispute, except to the extent federal or state law prohibits this limitation of damages or this Agreement otherwise permits. Each party's liability will be limited to compensatory damages, including claims for actual damages or losses and for lost future earnings or profits. Any claim for lost future earnings or profits will be limited to a maximum period of one (1) year. The parties specifically agree the provisions of this Subparagraph 17.a. will apply even if applicable governing law or arbitration rule permits an award for the type of damages the parties agree will not be available under this Agreement.

b. The parties further agree that a party's total liability for Disputes, as limited in Subparagraph 17.a., is further limited to an amount not greater than (1) $80,000, as adjusted for inflation annually at the end of each full calendar year based upon the percentage change in the Consumer Price Index (United States City Average, All Urban Consumers, All Items), or a comparable substitute if no longer used, or (2) the minimum amount in controversy necessary for federal diversity jurisdiction under 28 United States Code Section 1332; whichever yields the larger amount.

**18. CONSENT TO TERMS OF AGREEMENT.** You acknowledge you read and understand this Agreement, including any addenda and exhibits, and you agree to be bound by all of its terms and conditions.

**19. ACKNOWLEDGEMENT.** YOU ACKNOWLEDGE NO REPRESENTATIONS HAVE BEEN MADE TO YOU EXCEPT THOSE SET FORTH IN THIS AGREEMENT, THE OFFERING CIRCULAR, AND OUR ADVERTISING MATERIALS; AND YOU HAVE NO CLAIMS OF ANY TYPE AGAINST US, OUR AFFILIATES, THE DEVELOPMENT AGENT, OR OUR AGENTS, REPRESENTATIVES, SHAREHOLDERS, DIRECTORS, OFFICERS AND EMPLOYEES, OR THOSE OF OUR AFFILIATES AND THE DEVELOPMENT AGENT, EXCEPT ANY REPRESENTATIONS OR CLAIMS YOU WROTE IN THE SPACES PROVIDED IN PARAGRAPHS 15 AND 16.

**IN WITNESS WHEREOF,** the parties have executed this Agreement, as of the date first written above.

FRANCHISEE(S):

_____
Franchisee            Manoj Tripathi

_____
Franchisee            Sadhana Tripathi

_____
Franchisee

_____
Franchisee

DOCTOR'S ASSOCIATES INC.

By:_____

Title:_____

DAI 04/01

12